IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LOUISIANA OYSTERMEN ASSOCIATION, INC.** ) | **CIVIL ACTION NO.: 2:16-cv-10171** |
| **Plaintiff,** ) | |
| **v.** ) | **JUDGE____** |
| ) | |
| **HILCORP ENERGY COMPANY,** ) | **MAGISTRATE JUDGE_____** |
| **Defendant.** ) | |
| ) | |

---

### COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND CIVIL PENALTIES

---

### INTRODUCTION

1. Louisiana faces an environmental and humanitarian crisis caused in substantial measure by the cumulative impact of decisions made by oil companies who placed project profitability over the interests of preserving the coast. The damage falls particularly hard on commercial and subsistence fishermen, who depend on healthy coastal estuaries and the fisheries they support.

2. Although the wisdom of carving unnecessary canals and channels throughout the coastal zone is now beyond dispute, the practice is not a "legacy" relegated to the past.  In this case, Louisiana's largest active producer, Hilcorp Energy Company, did not comply with the Clean Water Act permit process, which helps protect Louisiana's wetlands.  Instead, Hilcorp chose to implement a drilling project and dredge through subsiding coastal water bottom without compliance with the law.

3. The Louisiana Oystermen Association believes that the survival of the fisheries and

1

fishing culture requires a different approach, the implementation of sustainable practices that harmonize the different uses of our coastal resources. The Louisiana Oystermen Association brings this Clean Water Act citizen suit, and other regulatory challenges, to establish these principles, to halt and rectify lawless conduct, and to force the oil industry to commit to be part of the solution—not part of the problem.

## JURISDICTION AND VENUE

4.   This Court has federal-question subject-matter jurisdiction pursuant to the Clean Water Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331.

5.   In accordance with the notice requirements of the Clean Water Act's citizen suit provision, 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2, LOA provided sixty-days written notice to Hilcorp, as well as to state and federal regulators, outlining Hilcorp's violations of the Act.  *See* Exhibit A, LOA Notice Letter, Feb. 16, 2016.  LOA's notice letter was postmarked on February 16, 2016.  *See* Exhibit A, p. 1; 40 C.F.R. § 135.2(c).

6.   Hilcorp's violations are ongoing as Hilcorp has failed to remedy or even acknowledge the unlawful dredging and filling at issue.

7.   Hilcorp's violations are continuing and/or intermittent because there is a strong likelihood, based on past conduct, that Hilcorp will continue to dredge and fill coastal wetlands without a permit in the future, in violation of the Clean Water Act.

8.   Venue is appropriate in this judicial district pursuant to 33 U.S.C. § 1365(c), because the violations of the effluent standards and limitations giving rise to the claims in this suit occurred in the Eastern District of Louisiana, in Plaquemines Parish, Louisiana.

## PARTIES

9.   Plaintiff LOUISIANA OYSTERMEN ASSOCIATION ("LOA") is a Louisiana non-profit corporation based in Plaquemines Parish, Louisiana. LOA members live in, and lease or fish on oyster reefs in, southeast Louisiana.  LOA's mission is to protect the oyster industry and the environment upon which its development depends and to enhance the livelihood of LOA members in building oyster reefs and cultivating oyster crops.  LOA advocates for the enforcement of laws meant to protect the oyster industry and has an interest in defending its members' crops from damage caused by the oil industry. LOA is a "citizen" within the meaning of the Clean Water Act's citizen-suit provision, 33 U.S.C. § 1365(a). *See* 40 C.F.R. § 135.1(a).

10. Defendant HILCORP ENERGY COMPANY ("Hilcorp") is a multi-billion dollar Texas corporation with its headquarters in Houston, Texas. Hilcorp is one of the largest privately owned oil and gas producers in the United States, and states it is the largest oil and gas producer in Louisiana. Hilcorp is responsible for permitting its exploration and production projects and for the conduct of its contractors, over whom it exercised supervision and/or control.

## BACKGROUND

### I.    The Clean Water Act, 33 U.S.C. § 1251, *et seq.*

11. Faced with a national crisis of water pollution, Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters."  33 U.S.C. § 1251. The goal of the Clean Water Act is the elimination "the discharge of pollutants into navigable waters."  33 U.S.C. § 1251(a)(1).

12. The Clean Water Act effectuates its goal through a permitting system. Section 301 of the Act prohibits the "discharge of any pollutant by any person" without proper authorization, such

as a permit issued under section 404 of the Act.  33 U.S.C. § 1311(a). The Act imposes strict

liability on violators. *United States v. St. Bernard Parish*, 589 F. Supp. 617, 619 (E.D. La. 1984).

13. The Act defines a "pollutant" broadly to include "dredged spoil… rock, sand, cellar dirt

and industrial, municipal, and agricultural waste discharged into water."  33 U.S.C. § 1362(6).

Dredged spoil or material "means material that is excavated or dredged from waters of the

United States."  33 C.F.R. § 323.2(c). Redeposited dredged sediment is a "pollutant," because it

is a type of dredged spoil.  *U.S. v. M.C.C. of Fla., Inc.*, 772 F.2d 1501, 1505–06 (11th Cir. 1985);

*see also* 33 C.F.R. § 323.2(d)(1)(iii)(specifying that a discharge of dredged material includes

material "redeposit[ed]" into a water of the United States "incidental to any activity, including

mechanized land clearing, ditching, channelization, or other excavation").

14. The "discharge of a pollutant" under the Clean Water Act, is "any addition of any

pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  "Point source[s]"

are "any discernible, confined and discrete conveyance, including but not limited to . . . vessel[s]

or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

The vessels at issue in this litigation are each a "point source."

15. Section 404 of the Clean Water Act requires persons to obtain a permit from the U.S.

Army Corps of Engineers prior to discharging "dredged or fill material" into waters of the

United States.  33 U.S.C. § 1344; *see* 33 C.F.R. §§ 323.2–323.4.  Absent a "404 permit," no

person is allowed to dredge sediment in our nation's wetlands and waters.  *See* 33 U.S.C. §§

1311(a), 1344. The permit process is designed to assure that applicants who wish to exploit

water-bound resources do so in a manner that avoids harm or compensates for any destruction of

wetlands or damage to coastal hydrology that their economic activity may cause.

16.   To obtain a Section 404 permit for work in a coastal area, like Plaquemines Parish, an applicant also must fully comply with a state's coastal permitting program. *See* 33 C.F.R. § 320.4(h). In Louisiana, the Department of Natural Resources issues coastal use permits, which themselves require applicants to undertake an alternatives analysis to ensure the applicant minimizes the project's environmental impact, particularly to wetlands and water bottoms. *See* La. Rev. Stat. Ann. § 214.30; La. Admin. Code tit. 43, pt. I, §§ 701–719, 723–24.

17. Had Hilcorp complied with the Clean Water Act, it would have had to apply for both a Section 404 and state coastal-use permit.

18. The failure to obtain a permit under Section 404 prior to dredging, displacing, redepositing and/or filling sediment in a water of the United States is a violation of an effluent standard or limitation and is actionable under the citizen suit provision of the Clean Water Act. As detailed below, Hilcorp violated the Clean Water Act by failing to obtain a Section 404 permit before dredging and discharging sediment in waters of the United States.

19. Section 505 of the Clean Water Act authorizes citizens' suits to enforce the Act's discharge limitations. 33 U.S.C. § 1365(a)(1). Under the Act, any citizen with standing may bring an enforcement action "against any person . . . who is alleged to be in violation of an effluent standard or limitation." *Id.* Citizen plaintiffs may obtain civil penalties of up to $37,500 per day for each violation, payable to the U.S. Treasury, as well as injunctive and declaratory relief, and attorneys' fees and expenses. 33 U.S.C. § 1319(d), (g)(6)(B); 40 C.F.R. §19.4; 33 U.S.C. § 1365(d).

20. LOA, a citizen with standing under the Act, sues for all of these remedies.

**II.    Oil Production and the Injury It Causes to the Coast and Oystermen**

21. Oil and gas producers and oyster fishermen regularly lease the same water bottoms, as is the case here. The oil and gas industry obtains surface leases to access pooled mineral reservoirs below the ground, through the construction of wells. Oyster fishermen obtain oyster leases and depend on firm water bottoms and clean water to raise their crop. Absent intervention and change, oil industry practices contribute to the degradation of the coast, including water bottoms, and threaten the sustainability of an oyster industry culture that has been transmitted across many generations.

22. The cheapest and most common method used by the oil industry to gain access to potential drill sites is called "prop-washing," or alternatively, "wheel-washing." Oil companies direct tug boats to use their powerful engines and very large propellers to scour channels through muddy water bottoms. When done, drilling rigs, barges, tugs, and other industry craft access previously shallow areas through the hollowed channel left behind.

23. Prop-washing is destructive, particularly to the oyster industry. The tug's propellers deconsolidate the water bottom sediments, turning the trenched water bottom into goo. A great deal of the sediment churned up by the propeller is suspended in the water column and is dispersed by the tide and force of the propeller over large distances. This sediment settles over time, and renders the bottom soft and muddy and more susceptible to tidal scouring. In this manner, some fraction of the sediment suspended in water columns near coastal passes, such as the case here, is likely transported by the tide offshore and lost to the system altogether.

24. Oyster fishers lease the right to plant and farm oyster beds from the state and/or private landowners. The ability to plant oyster beds depends heavily on a firm water bottom within the

boundaries of a lease. Oyster reefs are constructed by placing "cultch," usually rock or shell, on the water bottom. These beds are then usually cultivated by "seeding," the process of transplanting live oysters to the reef during a fertile period. Oysters require around three years to mature on reefs that progressively rise above the water bottom with each new generation. During this period, a fisherman risks losing his entire investment if a bed is destroyed.

25. The vitality of oyster reefs depends heavily on environmental factors, including turbidity. Because oyster reefs stand above the water bottom, and because oysters filter the water for nutrition, oyster reefs act as traps for the suspended sediments kicked up by prop-washing. The sediment stirred up and sprayed by dredging can quickly turn fatal to oysters by covering and smothering them, ruining the oyster harvester's large investment of time and money.

26. When the bottom sediments within an oyster lease are too soft, the rock and shell laid by oyster fisher will sink into the mud. In this manner, prop-washing can render water bottom either entirely incapable of supporting a reef or makes the construction of such a reef more expensive as the bed will need more rock.

27. Prop-washing, particularly without the installation of sediment curtains to contain the wash, has needlessly harmed LOA-member crops for many years and impaired reef creation on their oyster leases. Alternative methods, such as suction or bucket dredges, are far less injurious and enable the use of dredged sediment for purposes of marsh restoration.

28. These values, avoiding damage, mitigating damage, and the beneficial use of spoil for restoration, are indeed written into the law and part of the Clean Water Act permit process. Also, the Clean Water Act permit process allows for public comment, including by LOA members. LOA members were denied this participatory right in this case.  Unfortunately, Hilcorp prefers

the cheapest solution, to prop-wash, and refuses the available alternatives, contributing to a "death by a thousand cuts" to Louisiana's coast.

## STATEMENT OF FACTS

### III.     Hilcorp's Unpermitted Dredging in Violation of the Clean Water Act

29. On or about January 15, 2016, Hilcorp mobilized to "recomplete" its E. Cockrell Jr. 154 well (the "Cockrell 154 Well" or the "Well"), located near the shore of Lake Grand Ecaille, in Plaquemines Parish, on the eastern side of the Barataria Basin. The project lasted approximately one month.

30. Hilcorp chartered or otherwise obtained the services of a large drilling barge from Baywater Drilling in Houma, Louisiana.



31. The Baywater Drilling barge involved in the instant recompletion project at the Cockrell 154 site was the "Barge St. Elaine."

32. Upon information and belief, the Baywater Drilling barge used in the Cockrell 154 project drew approximately eight feet of water.

33. Hilcorp knew, or should have known, that based on the drilling barge alone, dredging would be required in water depths less than eight feet.

34. Hilcorp contracted and/or mobilized at least five different tugboats to "prepare" the site and/or move the drilling barge to the well location. Upon information and belief, these tugs included, without limitation, the Capt. Eddie, the Capt. Boo, the Miss Edmay, Miss Laurie, and Miss Kennedi.

35. On January 28, after staging the drilling rig just south of Lafitte, Hilcorp's vessels pushed and pulled the drilling barge south until arriving approximately one mile south of the Cockrell 154 Well. Upon information and belief, the drilling rig became stuck in Barataria Bay around St. Mary Point and had to be wheel-washed off.

36. On January 28 and 29, 2016, the drilling barge reached the project area near or in what was known as a shipping channel. These vessels—under the direction and control of Hilcorp—then turned north into the "Northern Reach" of its path, which consisted of shallow waters between the channel and the Well site.

37. During the course of the project, tugs were used to prop-wash the Northern Reach, between the shipping channel and the well site, for the purpose of deepening the water to transport the drilling rig to the well head.  Nearly the entire Northern Reach passed through oyster leases, including leases owned or worked by LOA members. The route is also adjacent to other oyster leases owned or fished by LOA members.  The tugs prop-washed a channel through these leases to deepen them, harming their water bottoms and spreading bottom sediment across the area.



38. On January 27, Hilcorp produced a pre-drilling survey, shown on the right, allegedly done after Hilcorp's unpermitted intrusion was revealed. The survey showed that water depths along this Northern Reach ranged from six to seven feet (adjusted to mean

9

low tide).

39. Other records indicated water depths even more shallow. Soundings conducted by the
Louisiana Department of Natural Resources agent who investigated this incident showed average
water depths of 6 feet in a portion of the reach. Where the drilling rig passed, the DNR agent's
soundings showed a depth of 8.5 feet.

40. A 2005 permit application submitted by Hilcorp for a previous project showed that it
intended to deepen much of the same route from a natural depth of 5 feet to 7 feet, to reach
another nearby well.  It is likely, therefore, that Hilcorp's rig and vessels were traveling in waters
of 7 feet or less, waters substantially shallower than the barge's draft.

41. To pull the massive drilling barge, with its draft of approximately 8 feet, across one mile
of shallow water, Hilcorp resorted to prop-washing.  In addition, photographic evidence such as
the image depicted below shows the Miss Laurie pulling the immensely heavy drilling barge
over the water bottom like a sled. Notably, the "7" is missing from the drilling barge - because it
would normally be below the waterline.



42. Hilcorp did not apply for a Section 404 permit for the Cockrell 154 Well recompletion

project, even though, as explained below, Hilcorp actually engaged in repeated, ongoing and intentional prop-washing and/or dredging to scour a channel through shallow water to reach the Well.

43. A LOA member observed, videotaped, and/or photographed Hilcorp's vessels prop-washing, wheel-washing, or otherwise dredging the water bottom to create a channel deep enough for the associated rig to access the Well site.  Tugs associated with the project, as well as the rig barge itself, repeatedly appeared to run aground on shallow water bottom.  Moreover, video captures sediment-laden water spewing from around the propeller of tugs and near the barge itself.

44. Over the length of the access route, Hilcorp's vessels dredged a large volume of sediment which dispersed and scattered in the surrounding area. Some sediment landed on oyster leases owned by LOA members.

45. LOA members asked Hilcorp to stop its unlawful dredging at a time when Hilcorp still could have significantly mitigated the damage.  On January 28, 2016, prior to Hilcorp moving the rig along the Northern Reach to the well, undersigned counsel's firm sent Hilcorp a cease-and-desist email.  The following day, counsel reported Hilcorp's unlawful activity to the U.S. Army Corps of Engineers and the Louisiana Department of Natural Resources.  LOA members independently made a similar report to responsible officials.  Nonetheless, Hilcorp refused to halt its unlawful conduct.

46. On February 5, 2016, while the rig was still working at the Well site, the Louisiana Department of Natural Resources sent an official to conduct a field investigation of the incident. The field agent reported:

Soundings were made on either side of this gap and within the area where the equipment was supposedly moved. **It appears that the average depth in the area was approximately 6' while within the opening, the depths were closer to 8.5 feet. This indicates that a propwshing [sic] "cut" of bottom material may have occurred**.  A drilling rig with a barge and two tugboats was seen moored to the platform supporting the Cockrell 154 Well. No authorization was given for this activity as it is my understanding that sidetracking of an existing well would not require this unless dredging was involved.

47. The vessels associated with the Cockrell 154 Well recompletion project dredged further sediment in the process of removing the rig from the Well and transporting it back to port.

48. Hilcorp has refused to acknowledge its dredging or the damage it caused.  Rather, upon information and belief, Hilcorp misrepresented its activities to regulators and to counsel.  Hilcorp asserted that its vessels and drilling-rig barge had a maximum draft of just four feet.

49. Hilcorp has never acted to repair any damage it caused, and, as such, its unlawful dredge and fill is ongoing and continuing.

50. Moreover, Hilcorp will continue to dredge sediment in the region of the Cockrell 154 Well in the near future in attempts to access the Well site once again.  Given its past corporate practice, and its practice in this case, Hilcorp will engage in similar misconduct at the Well site and elsewhere in Plaquemines Parish intermittently and indefinitely, absent this Court's intervention.

51. Neither the federal nor state government has yet issued a penalty to Hilcorp, nor have they prosecuted Hilcorp for the above-described violations.

IV.    **Hilcorp's Past Non-Compliance with Regulatory Requirements**

52. The violations at issue in this suit are not isolated.  Regulatory agencies on numerous occasions have cited Hilcorp for violating the Clean Water Act and other environmental and safety laws in the past, both in Louisiana and in other states.  The U.S. Environmental Protection

12

Agency has undertaken at least four compliance actions against Hilcorp for violating the Clean

Water Act in the last ten years.  In Louisiana, the state's Office of Conservation, in charge of

drilling regulations, has a an 18-page-long operator warning, violation, and compliance record

for Hilcorp, with numerous civil fines issued against the company.  *See* Exhibit B, La. Office of

Conservation, "Operator Compliance Details" for Hilcorp.  In the last ten years, Louisiana's

Office of Coastal Management, in charge of coastal-use permitting, has cited Hilcorp

approximately 11 times for violations of the state's coastal-use permit program's requirements.

53. In particular, the Office of Coastal Management has several times found that Hilcorp

engaged in unpermitted dredging of water bottoms or the unpermitted destruction of marsh in the

company's efforts to drill for oil in Louisiana.

54. Similar to the case at bar, in a 2013 enforcement action undertaken by the Louisiana

Department of Natural Resources, Hilcorp represented to regulators that it would only use barges

with four feet of draft to access wellheads in Plaquemines Parish. As a result, Hilcorp asserted it

would not need a permit to dredge.  In investigating complaints about Hilcorp's conduct,

however, state officials concluded that Hilcorp had in fact destroyed 1.83 acres of existing

wetlands near three wells in this project alone and that Hilcorp had failed to adhere to the no-

dredge plan described in its permit application.  Like here, Hilcorp attempted to deny the

allegations.  Hilcorp ultimately paid $87,000 to the state's Coastal Mitigation Fund to

compensate for the wetland acreage destroyed.

55. In addition, Hilcorp has been cited for failing to abide by federal and analogous state laws

when drilling for oil and gas in other states.  Most recently and notably, regulators have

penalized Hilcorp for substantial and repeat violations of federal and state environmental and

13

safety regulations in Hilcorp's drilling operations in Alaska's North Slope and Cook Inlet fields.

56. As one example, the U.S. Environmental Protection Agency initiated a Clean Water Act enforcement action against Hilcorp's Alaska subsidiary for leaking approximately 339 barrels of crude oil and produced water into remote wetlands near the Arctic Ocean in mid-winter.  In January 2016, Hilcorp's Alaska subsidiary agreed to pay a $100,000 civil penalty to resolve the case.

57. The Alaska Oil and Gas Conservation Commission has repeatedly levied hefty fines against Hilcorp for regulatory violations.  In November 2015, the agency proposed penalizing Hilcorp $720,000 for failing to follow proper nitrogen cleanout procedures in an incident that nearly led to the death of three rig workers.  In another report, the Alaska Oil and Gas Commission summarized that:

> [The] violation and Hilcorp's lack of candor regarding what happened are neither isolated nor innocent and are emblematic of ongoing compliance problems with Hilcorp rig workover operations. Hilcorp's compliance history in conducting hydrocarbon development activities in Alaska includes ongoing failures to obtain necessary approvals; failures to install, maintain, and test required well control safety systems; failures to perform required tests; and use of equipment that is unsuitable for the operating environment.

58. Hilcorp's past practice demonstrates that unless the Court enjoins Hilcorp's conduct and imposes a severe penalty, Hilcorp will not alter its unlawful behavior and will in fact continue to repeat its violations of the Clean Water Act in dredging wetlands without obtaining a Section 404 permit.

## CAUSE OF ACTION
### (Repeat and Ongoing Violations of the Clean Water Act)

59. LOA incorporates by reference the allegations contained in paragraphs 1–59 above.

60. Hilcorp directed and oversaw, and had responsibility and control over, the entire Cockrell

154 Well recompletion project, including the dredging described in this complaint.  The work at

issue in this suit was conducted for the benefit of Hilcorp. Hilcorp had the obligation to apply for

all permits associated with the project.  Hilcorp is subject to liability under the Clean Water Act.

61. The area in which Hilcorp engaged in unlawful dredging, Lake Grand Ecaille, is a "water

of the United States" under the meaning of the Clean Water Act, 33 U.S.C. § 1362(7).

62. The vessels used by Hilcorp to perform the Cockrell 154 Well recompletion project, and

which actively dredged sediment, are "point sources," under the meaning of the Clean Water

Act, 33 U.S.C. § 1362(14).

63. Hilcorp's dredging, including prop-washing, of vessel access canals to reach the Cockrell

154 Well constitutes the repeated and ongoing discharge of pollutants into the waters of the

United States by means of dredging and dispersing sediment.

64. Hilcorp failed to obtain any permit that would authorize it to discharge any pollutant.  *See*
33 U.S.C. §§ 1311, 1344.

65. Hilcorp has failed to remedy its violations of the Clean Water Act and therefore remains

in violation of the law.

66. Hilcorp will continue to violate the Clean Water Act, unless and until this Court delivers

relief in equity and statutory civil penalties.

67. Hilcorp's past conduct calls for civil penalties rising to the statutory maximum of

$37,500 per day for each violation.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

68. The violation continues unless and until Hilcorp restores the damage it caused.

69. In determining civil penalties, the Court is to "consider the seriousness of the violation,

the economic benefit (if any) resulting from the violation, any history of such violations, any

15

good-faith efforts to comply with the applicable requirements, the economic impact of the

penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

70. Hilcorp's violations, dredging an extensive channel without a permit, is serious in light of

the crisis facing Louisiana's coastal wetlands. Destabilizing the water bottoms hinders armoring

both by oystermen, an ancillary protection provided by reefs, and for use in coastal restoration

projects. Hilcorp's conduct is emblematic of the very behavior by the oil industry that helped

precipitate the crisis in the first place.

71. The economic benefit Hilcorp gained was significant.  By deciding to propwash without a

permit, Hilcorp avoided the costs of applying for a Section 404 permit, as well as the possibility

that Hilcorp would be required to use the dredged spoil material in an beneficial manner, like

restoring the eroding islands located just east of the project. In fact, several decades ago, the

whole area was wetland.  Hilcorp also avoided the possibility that it would be required to

undertake costly projects to remediate the harm it caused.

72. Because the issuance of a 404 permit requires an alternatives analysis of project less

injurious to the environment, for instance, using directional drilling from less sensitive areas to

tap the same reserve, Hilcorp's application for a permit may have been denied altogether. Or,

Hilcorp would have been required to use more costly dredging techniques that would have

minimized sediment displacement, such as the deployment of sediment curtains.

73. All of these measures would have made the decision to recomplete the Cockrell 154 Well

more costly and, in fact, may have dissuaded Hilcorp from drilling at all.  Instead, by proceeding

illegally, Hilcorp profited by drilling for oil without paying the attending environmental costs.

Hilcorp left those costs to be borne by Louisiana taxpayers and LOA members.

16

74.  As alleged above, moreover, Hilcorp has a prior record of violating state and federal environmental laws in pursuit of profit, including past violations analogous to the ones at issue in this case.  Hilcorp's record, including substantial prior violations, supports a higher penalty.

75. Additionally, Hilcorp did not make any good-faith effort to comply with the Clean Water Act's Section 404 permit requirements.  Rather, Hilcorp concealed its activities, as will be shown at trial, and actively misrepresented its project and vessel drafts to regulators.

76. To have any economic deterrent effect on a company Hilcorp, the court must issue appropriate injunctive relief and a civil penalty that will deter Hilcorp from perpetuating the violations forming the basis for this suit and committing future violations.

## PRAYER FOR RELIEF

WHEREFORE, the Louisiana Oystermen Association respectfully prays that this Court grant it the following relief:

(1)     A declaration that the Defendants' actions dredging and filling with sediment constitute violations of the Clean Water Act and its implementing regulations;

(3)     An award of civil penalties in an appropriate amount based on the number of individual violations and number of days in which the Defendants were in violation of the Clean Water Act;

(4)     A mandatory injunction requiring the Defendants to take the actions necessary to restore the water bottom;

(5)     A prohibitory injunction to prevent Hilcorp from repeating its violations of the Clean Water Act in the future;

(5)     An order retaining jurisdiction of this matter to ensure compliance with the

Court's decrees;

(6)     An award of LOA's attorneys' fees, expert fees, and other costs pursuant to the

Clean Water Act, 33 U.S.C. § 1365(d), and/or any other appropriate fee-shifting provision; and

(7)     Such other and further relief as the Court finds proper.

Dated this 14th day of June, 2016.

Respectfully submitted,

WALTZER WIYGUL & GARSIDE LLC

*s/*Joel Waltzer
Joel Waltzer, LA Bar #19268, Trial Attorney
Michael L. Brown, LA Bar #35444
Waltzer Wiygul & Garside LLC
1000 Behrman Highway
Gretna, LA 70056
Telephone: (504) 340-6300
Fax: (504) 340-6330
*Attorneys for the Louisiana Oystermen
Association*

Plaintiff's Address:
Louisiana Oystermen Association
140 Espy Lane
Pointe à la Hache, Louisiana 70082